## MUSSER ET AL. V. HERSHEY.

1. **Riparian Rights:** EXTENT OF OWNERSHIP. The title of a riparian owner upon a navigable stream extends only to the ordinary high water mark, the whole bed of the river being vested in the public. Following *McManus v. Carmichael*, 3 Iowa, 1.

2. ————: ————: FRANCHISE. Such owner may construct bridges, piers and landing places beyond the line of his ownership, provided he does not obstruct the paramount right of navigation; but this is a mere franchise appurtenant to the riparian proprietorship, and is not the subject of independent sale.

3. ————: ARTIFICIAL BANK. Where a levee was shown to have been judiciously located by a competent engineer and agents of the State, acting under authority conferred by the State legislature, it was *held*, that such levee became the boundary line of high water mark, and that no private ownership could be acquired to land lying between that and the bed of the stream.

4. ————: MEANDER LINES. Meander lines are located not as boundary lines, but for the purpose of defining the sinuosities of the banks of the stream and determining the quantity of land included in the fractional tract subject to sale.

5. **Injunction:** SPECIAL DAMAGES. One who suffers special damages by an act affecting a public right, different in degree or kind from the general public, may ask an injunction restraining the commission of the act.

*Appeal from Muscatine Circuit Court.*

WEDNESDAY, MARCH 22.

THIS action was commenced in October, 1873, to restrain the defendant from filling up to high water mark fractional block number one, as designated upon the plat of South Muscatine, and situated near the water line of the Mississippi river.

On the 11th day of November, 1873, a temporary injunction was granted, as prayed.

On the 3d day of March, 1875, upon final hearing, the injunction was made perpetual, and the defendant was ordered to remove the obstructions already created. Defendant appeals. The facts are stated in the opinion.

*Cloud, Broomhall & Jones* and *Henry Jayne*, for appellant.

A riparian owner is one whose lands abut upon a water course or whose land is bounded by one. (*The Schools v. Risley*, 10 Wall., 110.) Each riparian owner is alike protected in his rights, and no one has easements save in front of his own premises, and these he may use subject only to the prior right of navigation. (*Railway Co. v. Schurmeir*, 7 Wall., 289; *The Schools v. Risley, supra; Tomlin v. R. R. Co.*, 32 Iowa, 109; *Cook v. Burlington*, 30 Id., 100.) The country bounded by a river extends to low water mark. (*Handley's Lesees v. Anthony*, 5 Wheat., 379; *McCulloch v. Aten*, 2 Ohio, 307; *Howard v. Ingersoll*, 13 How., 381.) When a State grants land without restrictions, the grantee holds it with all the appurtenances. (2 McLean, 382.) Under the laws of this State, appellant's rights are exclusive, except the prior public right of navigation. (*Kraut v. Crawford*, 18 Iowa, 552.) The riparian owner has the exclusive right to use his shore front as he deems proper, having respect to the rights of the public and other shore owners. (*Phillips v. Rhody*, 7 Met., 325; *Stinson v. Butler*, 4 Blackf., 285; *Cox v. The State*, 3 Id., 196; *Pollard v. Falis*, 2 How., 607; *Jones v. Soulard*, 24 Id., 65.) An action will not lie by an individual to restrain by injunction the commission of an act on the ground that it is a public nuisance or the usurpation of a franchise detrimental to all the people of the State. (*Manhattan, etc., v. Barker*, 7 Rob. (N. Y.), 523; *Higbee v. Camden, etc., R. Co.*, 5 C. E. Greene (N. J.), 435; *Willard v. Cambridge*, 3 Allen, 574; *Harvard Coll. v. Stearns*, 15 Gray, 5.)

*Richman & Carskaddan* and *Hanna & Fitzgerald*, for appellees.

The bank of a stream is what retains the water in its channel when there is the greatest flow, and if changed either by natural or artificial means, the new bank becomes the line. (*Lockwood v. N. Y. & N. H. R. Co.*, 37 Conn., 387; Tyler on Boundaries, 157; *Pollard v. Hagan*, 3 How., 219.) The riparian owner has not title to the land between high and low water mark, although he has certain rights therein peculiar to himself. (*McManus v. Carmichael*, 3 Iowa, 1.) The riparian owner has free access to the navigable part of the stream. (*Yates v. Milwaukee*, 10 Wall., 497.) All other rights to the land between high and low water mark, except that of absolute title, subject to the servitude of the public, belong to the riparian proprietor. (*Schurmeir v. R. R. Co.*, 7 Wall., 287; *Kraut v. Crawford*, 18 Iowa, 550.) If the high water line is changed by any means, his rights follow the new line. (*Lockwood v. N. Y. & N. H. R. Co.*, 37 Conn., 387.) A riparian proprietor may sue an upper proprietor who disturbs his enjoyment. (*Nutall v. Bracewell*, 27 U. S. Dig., p. 547.) If a riparian owner obstruct the flow of water, and one below him sustains actual injury, he is amenable in damages. (*Buddington v. Bradley*, 10 Conn., 212.) Where an individual sustains special damage from a public nuisance, it becomes as to him a private nuisance, for which he may have his action. (*Georgetown v. Alex. Canal Co.*, 12 Pet., 91; Sedg. on Dam., §§ 32, 33.) An individual reasonably apprehending a particular injury from a public nuisance, may restrain it by injunction. (*Hougham v. Harvey*, 33 Iowa, 203; *Myers v. Malcom*, 6 Hill, 296; Angel on Water Courses, 6th ed., 756-7; *Corning v. Louern*, 6 Johns. Ch., 439.) A riparian proprietor may erect booms, and will be protected in their use. (*Morgan v. King*, 18 Barb., 278; *People v. Canal*, 32 N. Y., 401.) The city could not convey the property in question because it holds it in trust for the public generally. (Dill. on Mun. Corp., § 518; *Cook v. Burlington*, 30 Iowa, 94.) The meander is never a line of boundary; it merely indicates the quantity of land

the particular parcel contains. (*Middleton v. Pritchard*, 3 Scam., 522; *Kraut v. Crawford*, 18 Iowa, 533.) A patent issued by the United States cannot pass title to lands below high water mark. (*Haight v. Keokuk*, 4 Iowa, 213.) Plaintiffs, being riparian proprietors, have the right to the use of the shore for all legitimate purposes pertaining to their business. (*Muscatine v. Hershey*, 18 Iowa, 40; *Grant v. Davenport*, Id., 190.) Persons familiar with the business in controversy and possessing peculiar skill therein are experts. (1 Greenl. on Ev., § 440; *Crawford v. Wolf*, 16 Iowa, 567.)

DAY, J. — The property in controversy is situated in fractional section two, township seventy-six, north, of range ten west, on what is known as Muscatine island, an island formed by a slough extending from the Mississippi river. This property was entered in March, 1840. For some distance along the river extremity of this island, there was originally no well defined river bank, or, if there was one, it was so low that, in ordinary high water, the river flowed out and overflowed a considerable portion of the island.

In 1853, under special act of the legislature, the parties who owned the property contiguous to this portion of the river, constructed a levee from near the slough at the northern extremity of the island to a point south of the property now owned by the plaintiffs. At both extremities of this levee the river bank is abrupt and high, preventing the overflow of the river. The levee is from four to eleven feet in height, according to the surface of the ground, the usual height being about six feet. The object of the levee was to reclaim as much of the land as practicable, and it was built as near the river as it could be made to serve effectually the object in view. Its effect has been to reclaim large portions of the island which otherwise, at ordinary high water, would be entirely submerged. The meander line, run by the government at the time of the original survey of the island, is some distance outside of this levee, or between it and the low water line. In 1856, South Muscatine was laid out upon this island as an addition to the city of Muscatine. The pro-

prietors of South Muscatine had a contract with the C., R. I. & P. R. Co., by which the railway company was to take fifteen acres from the head of the island according to the original government survey; and in laying out the town the lines of the river blocks were extended beyond the levee and to the meander line to correspond with this tract contracted to the railroad company. From the plats exhibited this fifteen acres lies, for the most part, north of the northern extremity of the levee.

The plaintiffs own the property abutting upon the levee in question, from White street to Franklin street, a distance of four blocks. Were it not for the levee all this property would be overflowed at ordinary high water. The levee extends diagonally across block number ten, the northernmost block owned by plaintiffs, situated between Hanover and Franklin streets, entering it near the southeast corner and leaving it near the middle of the east half. At the point where the levee enters upon block ten it is crossed by Water street, which is projected north, upon the plat, a distance of one block between the levee and the meander line. East of Water street at this point, and hence wholly between the levee and the water line of the river, is what is designated upon the map as fractional block number one. This block was laid out by the original proprietors of the town. It is the usual length of a block. At the south end it was 132 feet wide to the edge of the water at the time the testimony was taken, and 155 feet to the meander line. At the north end it was 18 feet wide to the water's edge and 42 feet to the meander line. Upon the southernmost block, owned by plaintiffs, between White and Warren streets, and extending upon and occupying part of the levee in question, the plaintiffs, in 1870, erected mills for the manufacture of lumber, lath and shingles, at a cost of about $60,000. Plaintiffs have a boom in front of their property, located as far out in the river as practicable without interfering with navigation, into which logs are floated for the use of their mills. From the northeastern pier of this boom to the southeastern corner of fractional

block number one the distance is 345 feet. The ordinary length of a raft of logs is from 450 to 500 feet.

In April, 1870, the defendant purchased fractional block number one, above named, for $100. The evidence shows that this block is at least three feet below ordinary high water mark, and that it is frequently submerged to a depth of more than six feet. In 1873, defendant commenced filling this block with rattlings and other refuse from a mill which he owns further north, and he avowed his intention of filling the block and the adjacent projected streets above high water mark and erecting thereon a shingle mill. The evidence shows that if this is done, and the piers are erected which will be necessary for the accommodation of the mill, plaintiffs will be unable to float rafts into their boom but will be obliged to separate them and then " snub " them in at increased expense and inconvenience. The evidence quite clearly shows, also, by a very fair preponderance, that the effect of the work contemplated by defendant will be to create an eddy which will cause a sand-bar around and in front of plaintiffs' boom, thus greatly diminishing, if not entirely destroying, the value of plaintiffs' mill for the purpose for which it is now used. It is to restrain the further filling up of fractional block number one and the streets adjacent that this action is brought.

It is the settled doctrine in this State that a riparian proprietor upon a navigable stream owns only to ordinary high 1. RIPARIAN water mark, that is, to the edge of the bank, and rights: extent of ownership. that the whole bed of the river is in the public. *McManus v. Carmichael*, 3 Iowa, 1; *Haight v. The City of Keokuk*, 4 Iowa, 199, (212); *Tomlin v. The Dubuque, Bellevue and Miss. R. Co.*, 32 Iowa, 106. The party who entered the land in question from the general government acquired proprietorship only to ordinary high water mark, and of course could confer no greater rights upon his grantee. It is true such party would have the right to construct, below high water mark, bridge-piers and landing places, and to reclaim the soil, if he conformed to the regulations of the State and did not obstruct the paramount right of navigation. *Dutton*

*v. Strong*, 1 Black., 23; *Railroad Company v. Schumeir*, 7 Wallace, 272; *Lockwood v. N. Y. and New Haven Railroad*, 37 Conn., 387; *Yates v. Milwaukee*, 10 Wallace, 497; *Grant v. Davenport*, 18 Iowa, 179.

This right, however, does not exist in virtue of any proprietorship of the soil between high and low water mark. It

**2.——: ——:** is a mere franchise appurtenant to the riparian
franchise. proprietorship, and depends upon the ownership of the adjacent soil. It is not the subject of sale independently of a conveyance of the land to which it is appurtenant. *Phillips v. Rhodes*, 7 Metcalf, 322. These principles furnish the key to this whole case.

The levee in question was constructed pursuant to authority conferred by the State Legislature. Chapter 98, Laws of 1853, appoints William H. Miller and John C. Lockwood agents to superintend the construction of the necessary levees and drains to reclaim the swamp lands situated on Muscatine Island on the borders of Muscatine Slough, the locality in question. The testimony shows that Miller and Lockwood located this levee; that they employed the services of an engineer, and placed the levee as near the river as practicable. Abraham Smalley, who seems to have owned an interest in the property sought to be reclaimed, testifies as follows:

"When the levee was built Hobson and I tried to reclaim all the land we could and had the levee built as near the bank as we could from Hobson's to Biroz' brewery. It sloped out so that at Biroz' it was one hundred yards from the bank. At Biroz' the levee ran out as the ground was higher. Before the levee was made from about one hundred yards north of Hobson's it overflowed on an average about three feet at ordinary high water, and for a distance of about one-quarter of a mile. Sometimes the whole point overflowed."

Shepherd Smalley testifies: "Levee was built in 1853 and 1854. I worked on it. Height of levee along fractional block 1 was somewhere near nine feet. It was constructed to protect island as a barrier against the water. We had the services of an engineer in laying out levee, and judged that we placed levee as near the river as practicable."

G. W. Kincaid testifies: "The levee was built in 1853. I had the contract, and superintended its construction. General height along there is from four to eleven feet, according to the surface of the ground. It was constructed with reference to water of Mississipi of 1851, that being said to be the highest water ever known. Engineer was instructed to run levee three feet above high water in 1850, which he did. The levee was located as near the river at that particular point as was practicable. The object of the levee was to reclaim as much of the land as was practicable, and, considering the bend of the river, it was built as near the river as it could be made to serve effectually the object in view. Have had the location of fractional block 1 pointed out to me, and have been down there to-day and the ground differs in appearance between the levee and river from former situation. Beginning at the levee it sloped slightly two or three rods towards the river; then there was a little ridge a rod wide a few inches higher than the ground west of it. I discovered to-day that that ridge is not there."

There is nothing whatever in the case contradicting the testimony that the levee was judiciously located, as near to the river as practicable, and that its effect was the reclamation of all the land at that time susceptible of being reclaimed. We have, then, the levee located under authority of the State Legislature, by agents appointed by the State, assisted by an engineer whose competency is not assailed, and in addition to this we have uncontradicted testimony that the levee was located as near as practicable to the river. This levee, thus constructed, became the conventional or artificial bank of the river, and the boundary of high water mark. In the case of *New Orleans v. United States*, 10 Peters U. S. Rep., 711, levees constructed by the city of New Orleans were treated as natural boundaries, and accretions formed to such embankments were held to belong to the city as riparian proprietor. And in *Lockwood v. R. R. Co.*, 37 Conn., 387, it was held that the owners of land bounded on a harbor hold only to high water mark, but that they are entitled to recla-

3. ——: artificial bank.

mations made by changing high water mark, as they would have been entitled to natural accretions.

This levee, then, being the boundary of high water mark, it follows under the doctrine of *McManus v. Carmichael*, *supra*, and the other cases following it, that defendant has no private proprietorship over fractional block 1, which is entirely situated below high water mark. It is true the meander lines

4. ——: meander lines. extended beyond the levee, and even, it would seem, beyond ordinary low water mark. But these are run in surveying fractional portions of the lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as a means of ascertaining the quantity of the land in the fraction, subject to sale, and which is to be paid for by the purchaser. *R. R. Co. v. Schurmeir*, 7 Wall., 272; *Kraut v. Crawford*, 18 Iowa, 549.

The plaintiffs own the block situated between White and Warren streets, and extending to the levee. On this block and extending upon the levee, which is to be treated as the river bank, plaintiffs have erected their mill. They are, therefore, riparian proprietors, possessed of such rights in the stream fronting their premises as may be consistent with the paramount right of navigation, which exists in the public. This right partakes of the nature of property, and plaintiffs are entitled to the protection of the courts in the use and enjoyment of it. *Yates v. Milwaukee*, 10 Wallace, 497. It is competent for the plaintiffs, with due regard to the paramount rights of the public, to construct a boom in front of their premises, for the purpose of supplying their mill with logs. No one can wantonly or with impunity invade or abridge this right. The defendant has no interest in fractional block number 1, and hence he has, as against the plaintiffs, no legal right to make any change upon its situation or condition, which will affect the value of plaintiffs' property, or abridge their enjoyment of the franchises which are appurtenant to it.

II. The plaintiffs are entitled to the remedy of injunction.

The proofs show that if the filling is allowed to progress plaintiffs will sustain special damages, different **5. INJUNC-TION : special damages.** in both degree and kind from that which will be sustained by the public. See *Georgetown v. Alex. Canal Co.*, 12 Peters, 91; 6 Johnson's Chancery 439; *M., M. R. R. Co. v. Ward*, 2 Black., 485; 13 Howard's Practice Rep., 41 and 550; *Ewell v. Greenwood*, 26 Iowa, 377; *Hougham v. Harvey*, 33 Iowa, 203.

There is no error in the action of the court.

AFFIRMED.